## STATE v. MASON.

No. 5887. Decided April 27, 1938. (78 P. 2d 920.)

504

*Thatcher & Young* and *J. A. Howell,* all of Ogden, for appellant.

*Joseph Chez,* Atty. Gen., and *Grover A. Giles,* Deputy Atty. Gen., for the State.

WOLFE, Justice.

The primary purpose of this appeal is to test the constitutionality of chapter 4, Laws of Utah 1935, in so far as it requires a license to be obtained by persons other than commission merchants, who for the purpose of resale obtain from farmers possession or control of farm products without paying cash for the same at the time of obtaining such control or possession. Section 5 of the act provides in part as follows:

"No person shall act as a commission merchant, dealer, broker, or agent without having obtained a license as provided in this act."

Section 2 defines a "dealer" as follows:

"The term 'dealer' means any person other than a commission merchant who for the purpose of resale obtains from the producer thereof possession or control of any farm products, except by payment to the producer at the time of obtaining such possession or control, of the full agreed purchase price of such commodity in lawful money of the United States; *provided,* however, that the term 'dealer' as herein defined shall not be construed to include those who are regularly licensed under the laws of this state to sell tangible personal property exclusively at retail."

With this law in effect the defendant on September 5, 1935, purchased and obtained from R. S. Rice, a producer

of farm products as defined by the act, for the purpose of resale a thousand bushels of barley and paid for the same by his check drawn on the Commercial Security Bank of Ogden, Utah, for the agreed full purchase price. The check was duly presented for payment and paid. At the time of the transaction defendant did not have a dealer's license. The defendant at the time of the transaction was engaged in the business of buying farm produce and giving in payment therefor his check in the same manner as he had done in this case. All the above facts were stipulated at the trial of the case. It was further stipulated "that the defendant does not come within any of the exemptions provided in said Act. That the defendant desires a decision squarely on the question of the constitutionality of the statute."

The trial was founded on the following complaint filed before a justice of the peace:

"* * * that W. B. Mason on or about September 5th, 1935, at the County of Box Elder, State of Utah, did commit the crime of acting as a dealer without a license, a misdemeanor, as follows:

"That said defendant did then and there wilfully and unlawfully, for the purpose of resale, obtain from R. S. Rice, a producer, possession and control of 1000 bushels of barley without at the time of such delivery paying the full agreed purchase price of such commodity in lawful money of the United States."

The defendant demurred. It was overruled. On the facts stipulated substantially as above set out, he was found guilty. He appealed to the district court and was again adjudged guilty. He appeals to this court to test the constitutionality of the act. Defendant assigns as error the overruling of his demurrer to the complaint, his conviction of a violation of law, and the judgment sentencing him to pay a fine of $5.

The defendant relies entirely for a reversal on establishing the proposition that chapter 4, Laws of Utah 1935, is unconstitutional so far as it applies to so-called dealers because, he contends, it violates section 7, article 1, of the State Constitution, and section 1 of the Fourteenth Amend-

ment to the Constitution of the United States. The specifications are that the act, in requiring a person to take out a license in order to buy farm products on credit or by payment with a check, exempting those who buy for lawful money of the United States or those who are regularly licensed under the laws of the State to sell tangible property exclusively at retail, denies the equal protection of law and is taking property without due process of law.

A denial of the law's equal protection presupposes an unreasonable discrimination between those included and those excluded from the act whether the act confers a privilege or a right or imposes a duty or an obligation. In this case it imposes a duty and obligation to make an application and obtain a license before farm products may ■ be purchased by any other payment than United States money. It requires the payment of $35 for a license and implies the right of certain investigation of the applicant by the Department of Agriculture before license and certain investigation in case of complaint.

Of course, every legislative act is in one sense discriminatory. The Legislature cannot in one act legislate as to all persons or all subject matters. It is inclusive as to some class or group and as to some human relation- ■ ships, transactions, or functions and exclusive as to the remainder. For that reason, to be unconstitutional the discrimination must be unreasonable or arbitrary. A classification is never unreasonable or arbitrary in its inclusion or exclusion features so long as there is some basis for the differentiation between classes or subject matters included as compared to those excluded from its operation, provided the differentiation bears a reasonable relation to the purposes to be accomplished by the act.

Defendant claims an unreasonable discrimination in three respects: (1) Including in the operation of the act those who obtained possession or control of farm products by other than contemporaneous payment of cash and excluding those who paid contemporaneously with cash; (2) exclud-

ing those regularly licensed under the laws of the State, to sell tangible personal property "exclusively at retail"; (3) a discrimination in the class or group enjoying the intended protection in that it pertained only to farmers and excluded manufacturers and other businessmen. No question was raised as to the constitutionality on the ground that it constituted an unlawful interference with interstate commerce, so we shall not treat it in its interstate commerce aspect.

We conclude that none of the above classifications are arbitrary or unreasonable. In order to see whether the excluded classes or transactions are on a different basis than those included, we must look at the purpose of the act. The objects and purposes of a law present the touchstone for determining proper and improper classifications. The purpose of this law was to protect the farmers. From whom? From those whose credit was not good and who might, therefore, deprive him of his season's labor by hauling away the products of it and never paying. It was unnecessary to protect him against those purchasing with lawful money of the United States, hence their exemption. That was not only a reasonable distinction measured in the light of the object to be accomplished, but including cash buyers would have been useless and wholly unnecessary.

Exempting those who are regularly licensed under the laws of this State to sell tangible personal property exclusively at retail is likewise based on a difference in situation which makes it relatively unnecessary to license them as dealers. They have places of business in the State, are established, and in all likelihood have a credit rating fairly well known. They are not transients with trucks picking up farm merchandise or fly-by-nights. Viewed in the light of the purposes of the act, the exclusion of such licensed retail merchants was not unreasonable or arbitrary but rather natural and appropriate.

As to the third classification—farmers protected but not manufacturers or other businessmen. Passing over the

doubt as to whether it lies in the power of one not suffering from such discrimination to raise the constitutionality on this ground (the defendant is not a person extending credit who is claiming that the law discriminates in not protecting him), it is quite clear again that there is a reasonable basis for such classification. There are very definite reasons for including one and excluding the other class which may have seemed adequate to the Legislature. We as the judiciary cannot supplant their judgment with ours. The farmer is on an entirely different basis than the manufacturer or the merchant in his ability to protect himself from itinerant purchasers. The manufacturer knows generally to whom he can extend credit. The merchant sells for cash or knows the standing of his credit customers. That here and there some shrewd and businesslike farmer may have more business acumen and be more cautious than some manufacturers or merchants does not affect the general statement. If classification of such large groups so differently situated were not possible, practical and realistic legislation would be impossible In the case of *State* v. *Packer Corporation*, 78 Utah 177, 2 P. 2d 114, *Packer Corporation* v. *Utah*, 285 U. S. 105, 52 S. Ct. 273, 76 L. Ed. 643, 79 A. L. R. 546, it was held that advertisers of cigarettes in newspapers, magazines, and periodicals form a class for exclusion from an act making it unlawful for such cigarette manufacturers to advertise by billboard. It should not require much strain of the imagination when the classifications can be that refined to justify a classification between farmers on one side and manufacturers and merchants or others on the other side. See, also, *Breedlove* v. *Suttles*, 1937, 302 U. S. 277, 58 S. Ct. 205, 82 L. Ed. ____, a recent case where it was held it was not an unlawful discrimination to exact from all persons between 21 and 60 a poll tax of one dollar, exempting blind persons or females who do not register for voting. The court found a reasonable basis on which such females were excluded from the burden of the tax. The case of *State* v.

*Latham,* 115 Me. 176, 98 A. 578, L. R. A. 1917A, 480, if correctly decided, may be easily distinguished from this case. There is a substantial difference, on the one hand, between singling out for protection solely producers of milk by requiring semimonthly settlements for milk and omitting producers of eggs or other dairy products and, on the other hand, differentiating between farmers as a class and manufacturers as a class in choosing to protect one class and not the other. The same court would undoubtedly have held that, if a semimonthly payment for all dairy products had been required, it would not be invalid because it did not by the same act require semimonthly payment of all workers in factories. Certainly, two such groups so widely separated as to situation would not have to be included in one act so as to prevent denial of equal protection.

It is only where some persons or transactions excluded from the operation of the law are as to the subject matter of the law in no differentiable class from those included in its operation that the law is discriminatory in the sense of being arbitrary and unconstitutional. If a reasonable basis to differentiate those included from those excluded from its operation can be found, it must be held constitutional. This law as to all the classifications above set out meets these necessary tests and in such regard is constitutional. The point need not further be labored. We think that not only is the classification related to the object of the legislation, but necessary to accomplish it.

How fares it regarding due process? No complaint is made that there is lack of procedural due process, but only that substantially it lacks due process. It is somewhat difficult to determine from appellant's briefs in what respect he thinks the law offends against the due process clause. He does not divide his argument by specifying what provisions or situations arising out of the law work a denial of equal protection and what work a denial of due process. As we understand his argument, he contends that the purposes of the law are not related to the "health or morals of

the community" and are therefore not a proper subject for legislation; that consequently the act denies to defendant the right to enter into the transaction of business unless he obtains a license and that such transaction cannot constitutionally be conditioned on obtaining a license; that it is one of the fundamental rights which cannot be taken away or made conditional on administrative or legislative permission; that to attempt to do so by law is denial of due process. There might be some merit to defendant's contention if the act required a license for a single act of buying at wholesale, *regardless of what purpose the buying was for*.

It is true that section 5 of the act reads as follows: "Every person, acting as a commission merchant, dealer, broker, or agent as herein defined, shall file an application with the state board of agriculture for a license to transact *the business* of commission merchant, dealer, broker," etc. Further down in the same section, it specifies; "Such applicant shall further satisfy the state board of agriculture of his or its character, responsibility, and good faith in seeking to carry on *the business* stated in the application." Section 2, dealing with definitions, defines a commission merchant as one "who shall solicit from the producer thereof any farm product for sale on commission on behalf of such producer, or who shall accept any farm product in trust from the producer thereof for the purpose of resale, or who shall sell or offer for sale on commission any farm product," etc. It defines a dealer as above set out in this opinion. Apparently section 2 intended to make a single transaction of the types defined the badge of a commission merchant or dealer, as the case may be. The same section defines a "producer" as one "engaged in the business of growing or producing any farm product" and a "broker" as one "engaged in the business of soliciting or negotiating the sale of farm products." As later pointed out in this opinion, the purpose of protecting the farmer against those who bought outright and *took title* on credit was but

an extension of the purpose to protect the farmer against those who acquired possession but not title for purposes of selling on commission. The protection in relation to the transaction which makes one a dealer supplements the transaction which makes one a commission merchant. The two are of a piece. And we think it was intended to protect the farmer against what might be contended was a single transaction. If a person purchased at one time a number of truckfuls of farm produce with a check or on credit, for resale, he might maintain he was not in the business of dealing in farm products, but we think an integrated interpretation of the act makes such transaction a business. By this interpretation is reconciled the language of section 2 with that of section 5. Thus, we conclude that while the license is for carrying on the business of commission merchant or dealer, a single transaction involving the acquisition of farm products obtained for the purpose of selling *for* the farmer or *for resale by the purchaser* on his own account constitutes such person either a commission merchant or dealer, as the case may be. This interpretation does not affect any situation where one buys for his own use whether to feed to livestock which he later intends to sell or for personal consumption, or where he buys for his own use and later, finding no need for what he has bought, sells the produce. The constitutionality of an act might well be questioned which required one to obtain a license to buy any commodity for his own use where it was purchased by check or on credit. But in the cases affected by the Produce Dealers Act the transactions of purchase must be for the purpose of resale which may be denominated as a business, whether it is to be done once and not repeated or done repeatedly.

The act, therefore, seems to require little more than a license to carry on the business of selling pushed ahead to a point where it must be obtained before the preliminary transaction of buying is accomplished. In *Maycock* v. *White*,

83 Utah 446, 29 P. 2d 934, we held the business of *buying,* selling, and handling carload lots could be ▮▮▮ constitutionally required to be licensed. Mercantile business, which requires licensing, consists of the sum of transactions of buying and selling. In that sense, a merchant can neither buy nor sell until he is licensed. Moreover, there seems to be nothing in the way constitutionally of requiring those in the *business* of buying—those on the buying end of the transaction—to be licensed and regulated. It is quite common to compel dealers in their capacity as sellers to be licensed and regulated. We see no reason why dealers in their capacity as buyers may not be required to be licensed and regulated.

It is urged that the act bears no relation to public health, morals, or the general welfare of the State, the implication from the argument being that the power of the Legislature in an act of this sort must fall under such classification. We think it does bear a distinct relationship to the general welfare even though it does not cover ▮▮▮ every person in the State. Protective legislation rarely does that. But we think the defendant labors under a fundamental misapprehension regarding the powers of the Legislature. The Legislature has every power which has not been fully granted to the Federal Government or which is not prohibited by the State Constitution. *Salt Lake City* v. *Christensen Co.,* 34 Utah 38, 95 P. 523, 17 L. R. A., N. S., 898. By article 6, section 1, of the Constitution, the legislative power is vested in the Legislature and the people of the State of Utah. Certain limitations on this legislative power are specific in the State and Federal Constitutions. Certain other limitations not so specific reside in the due process clause of section 7, article 1, of our Constitution, and section 1 of the Fourteenth Amendment to the Federal Constitution. The whole field of powers exercisable by the Legislature is divided for convenience into police, revenue, and powers of eminent domain. And what does not fall within the realm of revenue and eminent domain is us-

ually classified as police power. But the real test is regardless of classification. Has the power been granted to the federal government exclusively and, if not, is it prohibited or limited by the State or Federal Constitutions, especially by the due process clauses? What defendant apparently has in mind is that, in determining what is or what is not due process as it affects the ordinary rights which citizens of all orderly governments enjoy, we generally look to see whether the legislation which affects or trammels those rights is reasonably related to and designed to protect the health, safety, morals, or public welfare of the people or any portion of them. This balance between police powers and due process is, therefore, more or less in a state of unstable equilibrium, changing with sociological and economic developments. As the protection of the due process clause recedes, the police power advances. There is always articulation between the two. In this case the legislation was for the protection of a large class of producers and sellers. It is a particular measure affecting a great group of persons. The right of buyers to buy in such case without interference or administrative regulation, ordinarily protected by this due process clause, must give way to the advancing exercise of police powers.

The defendant has much to say about the ineffectiveness of the act to accomplish its purpose; that it is a snare and a delusion. This goes to the wisdom and not the constitutionality of the act. Certainly, it is true that the license does not guarantee credit or assure payment and that a licensed swindler may have more liberty in regard to ■ buying than an unlicensed purchaser with a bank full of money. Of course, the same argument might be made against licensing doctors, morticians, plumbers, and the whole line of businesses or professions which are licensed for the purpose of regulation. An unskillful surgeon might still operate. None of it is perfect or guarantees in its protection. Regulatory legislation is not meant to absolve all persons from personal appraisal of the man at the other

end of the transaction. But, even from a standpoint of its wisdom, licensing and regulating businesses in most cases has proved highly beneficial to the public.

In the case of *Maycock* v. *White,* 83 Utah 446, 29 P. 2d 934, the questions raised in this case were expressly reserved, but the constitutionality of the act then in force, section 3-9-1, R. S. Utah 1933, requiring a license to buy, sell, or handle carload lots on commission, was sustained. The next development was an amendment of ▮ section 3-9-1, R. S. 1933, by chapter 3, Laws of Utah 1933, which required the licensing of those buying and selling farm products on commission in any quantities. Those laws were repealed and the present act substituted. Undoubtedly one of the reasons for substitution was to include another class called "dealers" who took title outright for resale rather than possession for sale as a commission merchant. It apparently appeared to the Legislature that there was little difference as far as the farmer was concerned between the case where his products were assigned to a commission merchant and he never received his money, and a case where a "dealer" took title, went off with the goods, and the farmer never received his money. The previous acts were designed to protect the farmer against commission merchants and consignees where the farmer retained title until sale. It was found just as necessary to protect him against those who bought outright, took both title and possession, and gave a "rubber" check in payment.

Acts somewhat similar involving like principles were upheld in the cases of *People* v. *Jarvis,* 135 Cal. App. 288, 27 P. 2d 77, in regard to which decision a writ of certiorari was denied by the Supreme Court of the United States in *Jarvis* v. *People of California,* 291 U. S. 648, 54 S. Ct. 527, 78 L. Ed. 1044, and *People* v. *Perry,* 212 Cal. 186, 298 P. 19, 76 A. L. R. 1331.

Although the point has not been argued, the demurrer to the complaint not only raises the question of the constitutionality of the act, but also the question of whether the

allegations are sufficient under the law, granted the same is constitutional.

Mr. Justice LARSON calls our attention to the fact that neither the new Code of Criminal Procedure, being chapters 116, 117, and 118 of Laws of Utah 1935, nor chapter 143, Laws of Utah 1937, in any way changes the required contents of a complaint in the case of a misdemeanor. Such complaint must state, among other things, the acts or omissions complained of as constituting the public crime or offense named. The act or omission, as far as this case is concerned, which constitutes the public offense under section 5 of chapter 4, Laws of Utah 1935, is that of assuming or attempting to act as a dealer without a license. As we have hitherto noted, the assuming to act as a dealer may be constituted by the single act of buying otherwise than by payment of lawful money of the United States for purposes of resale.

The complaint sets out definitely the act which constituted the assumption under the law of acting as a dealer and which was without license. The act or ██ omission which constituted the crime was set out as required in the case of a complaint for a misdemeanor.

In consequence of what has been above said, the conviction judgment and sentence are affirmed.

FOLLAND, C. J., and HANSON, J., concur.

LARSON, Justice (concurring in part, dissenting in part).

I agree that the Produce Dealers Act, being chapter 4, Laws of Utah 1935, is a constitutional exercise of the legislative powers. That agriculture is, in this State, a business affected with a public interest, cannot be doubted. The State is interested in the welfare of its agricultural producers, not only because they make up a large part of the population, but because it is essential to the public welfare that the people be assured of a constant and sufficient food supply,

and not dependent on foreign sources of supply. And, unless the farmer is assured such protection in his markets as to enable him to continue production without a constant loss, the whole population will be bereft of the means of sustaining life.

But there is involved in the instant case another question wherein I cannot agree with Mr. Justice WOLFE. A complaint was filed before the justice of the peace. Defendant demurred to that complaint as not stating a public offense. The demurrer being overruled, it was again urged in the district court, and the action of that court in overruling it is assigned as error. I think the assignment is well taken and, though the act itself is constitutional, this cause must be reversed because the complaint does not charge the commission of a public offense by defendant. The act in question, chapter 4, Laws of Utah 1935, is a license act; it requires a license *to engage in the business* of dealing in agricultural products, and such license shall entitle the holder thereof to *conduct the business* of dealing in agricultural products until the 1st day of January following its issuance, unless sooner revoked for cause. The penalty provisions declare that any person is guilty of a misdemeanor who assumes or attempts to act as a dealer without a license. Of course, what the Legislature meant was "who, without a license, assumes or attempts to act as a dealer." The pertinent parts of the act read:

"The term 'dealer' means any person other than a commission merchant who for the purpose of resale obtains from the producer thereof possession or control of any farm products, except by payment to the producer at the time of obtaining such possession or control, of the full agreed purchase price of such commodity in lawful money of the United States; *provided, however,* that the term 'dealer' as herein defined shall not be construed to include those who are regularly licensed under the laws of this state to sell tangible personal property exclusively at retail." Subsection (g), § 2.

"No person shall act as a commission merchant, dealer, * * * without having obtained a license as provided in this act. Every person, acting as a commission merchant, dealer, * * * shall file an appli-

cation with the state board of agriculture for a *license to transact the business of commission merchant, dealer,* * * * and such application shall be accompanied by the license fee herein provided for each specified class of business. Separate applications shall be filed for each class of business." Section 5.

"Such application shall in each case state the class, or classes of farm products applicant proposes to handle," etc. Section 5.

"Such application shall further state the principal business address of the applicant in the state of Utah and elsewhere," etc. Section 5.

"Such applicant shall further satisfy the state board of agriculture of his or its character, responsibility, and good faith in seeking to carry on the business stated in the application." Section 5.

"Licenses issued under the provisions of this act shall entitle the holder thereof to conduct the business described in the application therefor" etc. Section 5.

"For the purpose of enforcing the provisions of this act, the state board of agriculture is authorized to receive verified complaints against any commission merchant, dealer, * * * or any person, assuming or attempting to act as such," etc. Section 9.

"Every dealer must pay for farm products delivered to him or it at the time and in the manner specified in the contract with the producer, but if no time is set by such contract, or at the time of said delivery, then within thirty days from the delivery or taking possession of such farm products." Section 19.

"Any person is guilty of a misdemeanor who assumes or attempts to act as a commission merchant, dealer, broker, or agent without a license," etc. Section 21.

It seems that the rational construction of the act means that one who is licensed to engage in the business of buying and handling agricultural products for resale upon a credit basis is a dealer; that the unlicensed person engaging in such business is not a dealer but a person *assuming or attempting to act as a dealer* which is the offense made penal by the act. The complaint filed before the justice set forth:

"* * * that W. B. Mason on or about September 5th, 1935, at the County of Box Elder, State of Utah, did commit the crime of acting as a dealer without a license, a misdemeanor, as follows:

"That said defendant did then and there wilfully and unlawfully, for the purpose of resale, obtain from R. S. Rice, a producer, pos-

session and control of 1000 bushels of barley without at the time of such delivery paying the full agreed purchase price of such commodity in lawful money of the United States."

The so-called new form of procedure, the short form of indictment or information and complaints, is provided for by chapters 21 and 23 of title 105, R. S. Utah 1933, as newly enacted by chapter 118, Laws of Utah 1935. Violations of the Produce Dealers Act fall into two classes: Those which merely permit a forfeiture of license, and those which are classed as misdemeanors. The statutes above referred to cover only informations and indictments. In 1937 the Legislature amended section 105-11-1 by enacting chapter 143, Laws of Utah 1937, referred to by Mr. Justice WOLFE as a basis for his holding that the complaint is sufficient against demurrer. A reading of that chapter, however, will clearly demonstrate that this complaint is wholly defective and insufficient to state an offense. The amendment of 1937 did not alter or change the language or provisions of law as to offenses such as the one involved here. It is an exact duplicate of section 105-11-1, R. S. 1933, as far as that section went, but has added to that section the further provision that "in cases of public offenses triable upon information, indictment * * * the complaint, the right to a bill of particulars etc., shall be governed by the provisions of chapter 118, Laws of Utah 1935, the Short Form Procedure Act. By its express terms, therefore, it is limited to felonies and indictable misdemeanors. The reason for this is evident— to make the proceeding before the magistrate conform to the authorized proceeding in the district court.

But, except for offenses triable upon information and indictment, the complaint must state:

"(1) The name of the person accused, if known; or if not known and it is so stated, he may be designated by any other name.

"(2) The county in which the offense was committed.

"(3) The general name of the crime or public offense.

"(4) The acts or omissions complained of as constituting the crime or public offense named.

"(5) The person against whom or against whose property the offense was committed, if known.

"(6) If the offense is against the property of any person, a general description of such property." Chapter 143, section 105-11-1, Laws of Utah 1937, p. 254.

And to further emphasize the matter, section 105-57-2, relative to procedure in justices' courts, reads:

"Proceedings and actions before a justices' court for a public offense must be commenced by complaint under oath, setting forth the offense charged, with such particulars of time, place, person and property as to enable the defendant to understand distinctly the character of the offense complained of, and to answer the complaint."

It is therefore evident that complaints for simple misdemeanors must still conform to and be governed by the rules and decisions that have always prevailed. It must state the general name of the crime or public offense and also the acts or omissions complained of as constituting the crime or public offense named. And, of course, the words used in setting forth the general name of the crime or public offense is not a setting forth of the acts or omissions complained of as constituting the crime or public offense named. And so the complaint is fatally defective in that it does not allege or set forth that Mason did not have a license; neither does it allege that he did the act or acts for which a license is required, to wit, *engaged in, conducted, or transacted the business* of a dealer. It merely charges the making of a single, sole, isolated purchase, which Mr. Justice WOLFE concedes would not be within the act when he says it must be given a sensible construction and interpretation in meeting the argument that it would bar one farmer from buying a few feeder cattle from another on credit. I heartily agree with that statement by Mr. Justice WOLFE, because a single, isolated transaction, while it may be evidence of doing business, is not of itself sufficient to constitute "engaging in business," the right that is given by the license.

"Engaging in business" or "conducting the business of" implies of necessity a continuity or attempted continuity of a line of activity. Webster's New International Dictionary defines "business" as follows:

"* * * that which busies, or engages time, attention, or labor, as a principal serious concern or interest; specifically, (a) constant employment; regular occupation; work. (b) Any particular occupation or employment habitually engaged in, esp. for livelihood or gain."

Bouvier's Law Dict., Rawle's Third Rev., defines business as:

"That which occupies the time, attention, and labor of men for the purpose of livelihood or profit, but it is not necessary that it should be the sole occupation or employment. * * * The doing of a single act pertaining to a particular business will not be considered engaging in or carrying on the business, yet a series of such acts would be so considered. *Lemons* v. *State*, 50 Ala. 130; *People* v. *Com'rs of Taxes of New York*, 23 N. Y. 224."

This definition is also approved in *Industrial Fibre Co.* v. *State*, 31 Ohio App. 347, 166 N. E. 418; *Bankers' Holding Corporation* v. *Maybury*, 161 Wash. 681, 297 P. 740, 75 A. L. R. 1237; *Morgan* v. *Salt Lake City*, 78 Utah 403, 3 P. 2d 510; *Nelson* v. *Stukey*, 89 Mont. 277, 300 P. 287, 78 A. L. R. 483.

"Carrying on a business" does not mean performance of a single disconnected business act, but means conducting, prosecuting, and continuing by performing progressively all acts normally incident thereto, and "doing business" is defined as conveying the idea of business being done, not from time to time, but all the time. *Hutchings* v. *Burnet*, 61 App. D. C. 109, 58 F. 2d 514; *Mente* v. *Eisner*, 2 Cir., 266 F. 161, 11 A. L. R. 496.

Bear in mind that we are concerned here with a matter of pleading and not a matter of proof. It is sought to charge defendant with a violation of an act requiring a license to engage in a certain business. It seems too clear to require argument that to charge such an offense it is necessary to

522

allege that defendant was "engaging in the business" for which a license was required and that he had no such license. Those are the facts which would constitute an offense and must therefore be charged in the complaint. This being a license act, defendant is subject to prosecution not for doing a specified act which is totally prohibited, but for failing to obtain that which authorized him to engage in, or carry on, a business, before he engaged in or carried on that business. No such elements are involved in the charge in the complaint. Among cases which show the necessity for such allegations and how to plead violations of such acts, we may cite *Leps* v. *State,* 120 Ga. 139, 47 S. E. 572; *Commonwealth* v. *Nex,* 13 Grat., Va., 789; *State* v. *Willis,* 37 Mo. 192, 193; *State* v. *Cox,* 32 Mo. 566; *State* v. *Jacobs,* 38 Mo. 379; 25 Cyc. 636-7, and cases there cited; *Commonwealth* v. *Smith,* 69 Ky. 303, 6 Bush 303; *Mork* v. *Commonwealth,* 69 Ky. 397, 6 Bush 397.

But the decisions of our own court have settled the fate of this complaint. In the cases of *State* v. *Hale,* 71 Utah 134, 263 P. 86; *State* v. *Topham,* 41 Utah 39, 123 P. 888; *State* v. *Gesas,* 49 Utah 181, 162 P. 366, we have construed the statute as it still exists in respect to complaints in the justices' courts for misdemeanors. Such rules not having been met in this case, it follows that neither the district court nor the justice's court ever acquired jurisdiction to try the defendant, although we hold the act itself to be constitutional.

MOFFAT, Justice (dissenting).

W. B. Mason was convicted of the charge of engaging in the business of a "dealer" in farm products without a license, upon a complaint filed in the city court of Brigham City, Box Elder County, Utah; a representative of the State Board of Agriculture being complainant on behalf of the State. The charging part of the complaint alleges that W. B. Mason, acting as a "dealer" without a license, committed a misdemeanor in that "said defendant did then and there [January 17, 1936] wilfully and unlawfully for the purpose

of resale obtain from R. S. Rice, a producer, possession and control of 1000 bushels of barley without at the time of such delivery paying the full agreed purchase price of such commodity in lawful money of the United States," in violation of chapter 4, Laws of Utah 1935.

The defendant demurred to the complaint in the justice's court upon the ground that the complaint fails to state facts sufficient to constitute a public offense. The demurrer was overruled. The defendant thereupon pleaded "not guilty" for the reason the portion of the act relating to "dealers" is unconstitutional. He was found guilty in the justice's court and appealed to the district court.

In the district court the defendant again relied upon his demurrer and waived trial by jury. The demurrer was overruled. The cause was then submitted to the district court upon the following stipulated facts:

"It is stipulated between the plaintiff and defendant that the following are the facts which may be deemed in evidence and considered by the court to determine the guilt or innocence of the defendant of the crime of acting as a dealer without a license, a misdemeanor, charged in the complaint on file herein, to-wit, that the said defendant, on or about the 5th day of September, 1935, did then and there purchase and obtain from one R. S. Rice, a producer of farm produce, for the purpose of resale, *or possession*, of one thousand bushels of barley, without paying at the time of such delivery the full and agreed purchase price of said commodity in lawful money of the United States. That at the time of the acquisition and purchase of the barley, the defendant drew his check made payable to R. S. Rice, drawn on the Commercial Security Bank of Ogden, Utah, for the agreed full purchase price of the commodity and delivered the same to Mr. Rice, who immediately thereafter and in due course presented the check for payment, and the same was duly and regularly paid in regular course. That at the time in question, the defendant did not obtain a dealer's license before the acquisition and purchase of the barley in question, and that the defendant was engaged in the business of buying farm produce and giving in payment therefor his check in the same manner as in this case, and that the defendant does not come within any of the exemptions provided in said Act. That the defendant desires a decision squarely on the question of the constitutionality of the statute."

The trial court found the defendant guilty. The case is a test case and no moral turpitude attaches to the defendant because of the alleged infraction of the law as is indicated by the sentence of the district court of one day in jail with the sentence stayed.

Appeal brings this cause to this court with the assignments of error being the overruling of the demurrer and entry of judgment of conviction. Appellant contends the act is void as relating to "dealers" because "it is unreasonable, discriminatory class legislation, and that the control sought to be exercised bears no reasonable relation to the evils sought to be prevented." The statute says:

"The term 'dealer' means any person other than a commission merchant who for the purpose of resale obtains from the producer thereof possession or control of *any farm products*, except by payment to the producer at the time of obtaining such possession or control, of the full agreed purchase price of such commodity in lawful money of the United States; *provided, however*, that the term 'dealer' as herein defined shall not be construed to include those who are regularly licensed under the laws of this state to sell tangible personal property exclusively at retail." Section 2 (g), chapter 4, Laws of Utah 1935.

"No person shall act as a * * * *dealer*, * * * *without having obtained a license as provided in this act*. Every person, acting as a * * * dealer, * * * shall file an application with the state board of agriculture for a license to transact the business of * * * dealer, * * * and such application shall be accompanied by the license fee." Section 5, chapter 4, Laws of Utah 1935.

"For *filing the applications* herein described, each applicant must pay a fee as follows: * * *

"(b) Dealers: $35 for each year. * * *

"Any person who shall have been licensed as a commission merchant shall, upon application, be licensed also as a dealer and as a broker as defined herein, without payment of further fees, and shall thereupon conform to the parts of this act regulating the business of a dealer or broker." Section 6, chapter 4, Laws of Utah 1935. (Italics mine.)

Each of the sections, a part of which is above quoted, has been amended by chapter 8, Laws of Utah 1937, but none of

the amendments affect any part of the quoted portions of the above sections.

In addition to the above sections, we find a declared purpose of the statute in section 3 to be:

"It is recognized that the producer of farm products as defined in this act (the term 'producer' means any person engaged in the business of growing or producing any farm product, section 2, (c.) is subject to unusual hazards and losses in his dealings with certain persons (not 'dealers,' presumably) who seek to obtain and do obtain from such producer his products for resale upon a speculative basis." (Parenthetical words added.)

Another of the declared purposes of the act reads:

"And it is further recognized that it is in the public interest that such hazards and losses shall be minimized to the end that the production of such products shall be stabilized and perpetuated in order that the consumer [in this State] of such products may depend upon a constant and adequate supply thereof."

Then the following enlightening clause is added to complete the section:

"And to the end and purpose it is hereby declared to be the policy of the legislature that such dealings shall be regulated and systematized so as to safeguard such producer against such hazards and losses, and this measure is enacted for the purpose of providing such regulations."

As indicated, the objections to the statute are: (1) That it is unreasonable, discriminatory class legislation; and (2) that the control sought to be exercised bears no reasonable relation to the evils sought to be prevented. One of the declared purposes is to protect the producer from unusual hazards and losses in his dealings with certain persons who seek to obtain his products upon *"a speculative basis."* Another is the *stabilization* that the *consumer* may depend upon an *adequate* supply; and the third is that the dealings shall be *regulated* and *systematized* so as to safeguard the *producer* against hazards and losses.

Under subsection (g) of section 2, supra, one licensed to sell tangible personal property is not a dealer and yet he and all in his class may buy without paying the "full agreed purchase price * * * in lawful money of the United States," or without a "dealer's" license. The same would seem to be true of commission merchants, except that a commission merchant's license also licenses the holder as a "dealer" and "broker." This seems to be discriminatory.

Going back to the term "dealer." By exclusion, the statute makes *"any person"* who, for the purpose of resale, obtains *any farm products* from a producer, a "dealer." *Any person* is probably the equivalent of *all persons* as used in the statute. Then all persons who obtain the products specified from the producer, whether engaged in any business as such or not, are dealers, except those excluded by the statute, who are commission merchants and those who sell tangible personal property exclusively at retail and hold licenses for such purposes.

The statute does not purport to regulate or license a business. By its terms it requires a license for individual transactions on credit, or, put in the terms thereof, any person, other than the classes mentioned, who buys or otherwise obtains possession of the specified products without paying the full agreed purchase price in lawful money of the United States, is guilty of a misdemeanor. It is thus made a crime to do what all citizens had heretofore been presumed to have, in the very nature of commercial existence, a fundamental right to do.

The law may not be supported as a revenue measure, and the question of classification does not apply as there is no regulation involved. Why should the State or any municipality or agency of the State be concerned whether A and B deal upon a credit or a cash basis in their individual transactions? I have no quarrel with my brethren of the court as to the power of the Legislature to make reasonable classifications for regulatory purposes. However, neither the statute nor the application of it in the instant case bear any

reasonable relation to the declared purposes set out therein. Because a person seeks to obtain products for resale upon a speculative basis applies to cash as well as credit sales, whether licensed or not. How the fact that any person who buys on credit or who is required to pay *money* for his purchase will tend to stabilize and perpetuate an adequate and orderly supply to the consumer, others may be able to determine better than I. In the last analysis, it is an attempt to require the farmer or producer to sell to licensees on credit or for cash as he may be able to bargain, or hold his products until a cash customer arrives. Take an illustration: A says to B, "I will give you $1000 for 1000 bushels of barley and will pay you cash." B says: "If you will give me your note for $1050.00 payable in six months, I will sell it to you." A replies: "Nothing doing, I do not want to go to jail." B then says: "I do not need the money now. You do and can use it to advantage. I will take your note at 6 per cent, payable in six months." A would again be compelled to get a license or refuse the deal. Where does the element of regulation come in? What right is conferred upon A that he should not otherwise be entitled to exercise without the license? And wherein is B benefited or the public concerned whether he sells or holds his produce till kingdom come, or as long as he chooses to do so? Quoting from and citing the case of *Matthews* v. *Jensen,* found in 21 Utah 207, on page 218, 61 P. 303, we find the following:

" 'License,' in common parlance, implies permission to do something which may not be done without a license. In this sense we are to understand the word was used in the constitution and statutes, unless the context indicates a different or more comprehensive meaning. 'The object of a license,' says Mr. Justice Manning in *Chilvers* v. *People,* 11 Mich. 43, 'is to confer a right that does not exist without a license.' A mere tax imposed upon a business or occupation, therefore, is not a license, unless the levy confers a right or privilege as to the business which would not otherwise exist. So, a right to license a business or occupation does not imply a right to exact a tax merely for revenue, and where the object is revenue the power to license for that purpose must be conferred in unequivocal terms. Cooley's Const. Lim. 242.

" 'License,' in general, implies privilege and regulation, and the imposition of it falls within the police power of the state. That power may be exercised, and license taxes are frequently imposed, with a view to discourage business and occupations which are injurious in their tendencies and prejudicial to the public good, but, 'to justify a restrictive license, the business must of itself be of such a nature that its prosecution will do damage to the public, whatever may be the character and qualifications of those who engage in it.' Tied. Lim., p. 278."

The above case was cited and favorably commented upon in the later case of *Salt Lake City* v. *Christensen Co.,* 34 Utah 38, 95 P. 523, 17 L. R. A., N. S., 898.

Every doubt as to the constitutionality of a statute must be resolved in favor of its validity and before a statute may be declared invalid the repugnancy between the statute and the constitution must clearly appear. Such has been and now is the rule of construction in this State as to such matter. *Rio Grande Lumber Co.* v. *Darke,* 50 Utah 114, 167 P. 241, L. R. A. 1918A, 1193; *Stillman* v. *Lynch,* 56 Utah 540, 192 P. 272, 12 A. L. R. 552; *Blackmarr* v. *City Court of Salt Lake City,* 86 Utah 541, 38 P. 2d 725. On the other hand, "while courts do not lightly interfere with the Legislature in choosing or selecting methods of classification, yet they do not, and may not, shut their eyes to classifications that clearly and manifestly operate unequally, unjustly, and unfairly upon those who come within the same class." *Board of Education of Ogden City* v. *Hunter,* 48 Utah 373, 159 P. 1019, 1024. It was likewise stated in the case of *State* v. *Packer Corporation,* 77 Utah 500, 297 P. 1013, 1019, that a classification in order to be valid "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike," the quotation coming from *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 40 S. Ct. 560, 64 L. Ed. 989; *Blackmarr* v. *City Court,* supra. Upon this statement of the law we seem to agree.

Section 3 of the act discloses the purpose of the act and it appears clear that such purpose bears no relation to public

health, morals, or even the general welfare of the people of the State. It is declared that the producers of farm products, as defined in the act, seem to be subject to unusual hazards and losses wherein the producers have dealings with "certain persons." Who are these "certain persons," wicked, designing, or otherwise, with whom the producer is unable to cope, and how long since? Under the act all commission merchants must take out a license to carry on the business of a commission merchant. They are not required to take out a "dealer's" license, but, on the other hand, they are exempt.

If the act was intended to protect against cheats and frauds, it would seem not only to have failed, but to have opened the door to such by luring the producer into a false sense of security by the exhibition of a "dealer's" license when no such security may exist. The statute appears to be designed to compel the purchasers of farm products to pay in lawful money at the time of purchase or obtain a license. Carry cash and purchase at will—fail to do so and go to jail or pay a fine, where the purchase of farm products for resale is involved. The real effect of the statute seems to be to enable a particular class of producers to collect for their sales from persons not licensed, while trade moves unhampered between those licensed though they may not be able to collect.

The Fourteenth Amendment forbids the State to "deny to any person * * * the equal protection of the laws," and "equal protection of the laws" stands for the passage of such laws as will give such protection and forbids "class legislation." Discrimination as to legal rights and duties is forbidden. All persons under the same conditions are entitled to exercise the same rights and receive the same benefits and protection. Regulations for different localities, different classes, and different conditions, in order to be valid, must be reasonable and based upon real differences affecting fundamental rights and privileges.

In what way does compulsory payment in lawful money to the producer of farm products differ from the purchase of any other commodity? What is there in the purchase of such commodities for resale that constitutes a difference as to public health, public safety, peace, comfort, and general welfare; and the purchase for resale of lime, stone, cement, timber, lumber, or any other products, natural or manufactured? Differentiations and classifications must be based upon real differences and must be reasonable. Arbitrary classification is forbidden by the Constitution.

"If there be no real difference between the localities, or business, or occupation, or property, the state cannot make one in order to favor some persons over others." *State* v. *Latham*, 115 Me. 176, 98 A. 578, 579, L. R. A. 1917A, 480.

The case just cited related to a statute by which any purchaser of milk for resale should, unless otherwise provided for in the written contract, pay therefor on the 1st and 15th of each month. It was there held that the statute provided for an arbitrary classification relating to the purchasers of a particular product intended for a particular use and had no relation to public health, safety, morals, or welfare, and offended against the Fourteenth Amendment. In support of the proposition that "If there be no real difference between the localities, or business, or occupation, or property, the state cannot make one in order to favor some persons over others," a number of cases are there cited which need not be repeated here. May milk be regarded as a farm product? May butter, cheese, flour? And Aunt Jemima's pancake flour? If so, may not timber, lumber, nursery stock, plants, or flowers, be likewise made the basis of a classification?

For the same and additional reasons the act as it relates to and defines "dealers" must fail as being discriminatory. One who writes a check or draws a draft or delivers any other indicia of payment or orders to pay other than in money should not be required to contribute more to the rev-

enue of the State than one who carries his money in his pocket or perchance invites the producer to go to the bank for the cash while the produce is being loaded or shipped.

I am of the opinion that the act, in so far as it attempts to apply to and regulate "dealers" as therein defined, offends against section 1 of the Fourteenth Amendment to the Federal Constitution, and sections 7 and 24 of article 1 of the Constitution of Utah. The purchase of farm produce from a producer is essentially no different as an exercise of a common right than the purchase of farm produce from one not a producer. The statute attempts to license, not a business, but impose a burden upon individual transactions exercised as a common right. This may not be done. *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 52 S. Ct. 371, 76 L. Ed. 747. As was aptly said by Mr. Justice Frick in the case of *State* v. *Holtgreve*, 58 Utah 563, 200 P. 894, 899, 26 A. L. R. 696, relating to a tax on trading stamps of merchants obtaining them from third persons, but not on stamps of merchants issuing their own:

"It is the duty of this court to exercise the greatest caution so as not to interfere with the rights of the Legislature in passing laws, yet we must also be ever mindful of the obligation that we have assumed to obey and to defend the Constitution. In meeting the obligation imposed upon us in that regard, it is just as much our duty to prevent others from violating the Constitution as it is that we shall not do so. While it is entirely within the province of the Legislature to regulate commerce, traffic, trade, and business, in so far as such regulation may be necessary for the protection and welfare of the community, it is nevertheless the duty of the courts to protect and safeguard the rights of the individual whenever such rights are invaded from whatever source. Liberty in conducting one's own affairs in his own way where no rights of another or those of the community are invaded is just as essential as is the liberty of movement and thought. The right of transacting business should therefore be interfered with only in cases of necessity, and when the transactions do, or tend to, militate against the welfare of the community. If, however, business requires regulation, no exceptions should be made except such as are based upon reasonable and proper distinctions." *Salt Lake City* v. *Utah Light & Ry. Co.*, 45 Utah 50, 142 P. 1067; *Park City* v. *Daniels*, 46 Utah 554, 149 P. 1094, Ann. Cas. 1918E, 107.

The matter of penalty is not mentioned in the argument or briefs. It is, however, suggested that law enforcement officers may, with profit, examine section 21 of the act if other actions are instituted invoking the penalties of the act.

The act does not either define or license a produce dealer. It merely requires a license of any one buying for resale and not paying cash, without reference to the carrying on of a business. A question similar in its general import was discussed relating to this statute before the amendment was made generally defining a "dealer." See *Maycock* v. *White*, 83 Utah 446, 29 P. 2d 934.

The judgment of the trial court should be reversed, and the cause remanded, with directions to dismiss the same.